Lorraine KROMNICK, Lorraine Branca-to, Gladys Hirsh and Regina Katz

v.

SCHOOL DISTRICT OF PHILADEL-PHIA, and Board of Education of the School District of Philadelphia, Appellants.

No. 83–1144.

United States Court of Appeals, Third Circuit.

Argued Nov. 29, 1983.

Decided July 17, 1984.

Eugene F. Brazil, General Counsel, Martin Horowitz, Asst. General Counsel, School District of Philadelphia, Germaine Ingram (argued), University of Pennsylvania Law School, Philadelphia, Pa., for appellants.

Robert M. Goldich (argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellees.

Thomas K. Gilhool (argued), Michael Churchill, Stephen F. Gold, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for amici curiae Barbara Jordan, Gwendolyn Saunders, Cora Bazmore, Glenda Billings Poole and Linda Hewson.

Michael Hardiman, Asst. General Counsel, Pennsylvania Human Relations Commission, Philadelphia, Pa., for amicus curiae Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission.

Richard C. Dinkelspiel, Maximilian W. Kempner, Co-Chairmen, William L. Robinson, Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, Walter A. Smith, Jr., David F. Grady, Julie E. Stumpe, Hogan & Hartson, Washington, D.C., for amicus curiae Lawyers' Committee for Civil Rights Under Law.

Steven A. Asher, LaBrum & Doak, Philadelphia, Pa., Justin Finger, Jeffrey P. Sinensky, Leslie K. Shedlin, Anti-Defamation League of B'nai B'rith, New York City, Richard L. Berkman, Boston, Mass., Samuel Rabinove, Andrea S. Klausner, American Jewish Committee, New York City, Paul T. Sosnowski, Polish-American Congress, Phil-

adelphia, Pa., Marc D. Stern, American Jewish Congress, New York City, for amici curiae Anti-Defamation League of B'nai B'rith, American Jewish Committee, Polish-American Congress and American Jewish Congress.

Before GIBBONS, SLOVITER, Circuit Judges, and CALDWELL, District Judge*.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The School District of Philadelphia appeals from the orders of the district court permanently enjoining it from complying with its policy under which some teachers are transferred to other schools to maintain racial integration of faculty in each school. Teachers subject to transfer contend, and the district court agreed, that this policy violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Kromnick v. School District, 555 F.Supp. 249 (E.D.Pa.1983). We reverse the judgment of the district court.

## I.

### FACTS AND PROCEDURAL HISTORY

#### A.

##### Challenged Policy

Under the policy challenged in this action, the Philadelphia Board of Education seeks to maintain a faculty ratio at each school of between 75% and 125% of the system-wide proportions of white and black teachers.[1] As a result, the racial composition of each school's faculty reflects that of the overall teaching staff.

To reach this objective, the School District annually reassigns some classroom teachers to other schools. The reassignment plan operates in two phases. First, there is a determination of the need for staff at each school. Because of declining student enrollment, each year many schools have fewer positions. Open positions are staffed in order of accumulated seniority at the school, and the least senior teachers are transferred from the school. However, if that would cause the school to fall outside the 75%/125% range, teachers of the overrepresented race are transferred even though they have more seniority. Also, if retirements cause a racial imbalance in the school's faculty outside the 75%/125% range, again the least senior teachers of the overrepresented race are transferred even though they may have more seniority than teachers of the other race. Only a small percentage of teachers transferred are transferred in derogation of seniority. In the last year, approximately 50 or 60 of the 1,100 teachers transferred were transferred to maintain the 75%/125% racial balance.

In the second phase of the reassignment plan, all the transferred teachers are entitled to choose new schools in descending seniority order, unless their choice would bring the selected schools outside the 75%/125% range. If so, those teachers are required to forego their preferred choice of transfer.

In considering the School District's policy, it is also necessary to keep in mind several factors. First, layoffs, as opposed to transfers, are determined by strict seniority. App. III at 185a; Brief for Appellees at 6. Second, teachers required to be transferred retain accumulated "building seniority," whereas those who seek transfers generally lose that seniority. App. II at 137a. This affects transfer rights for the following school year. Third, transferred teachers retain a "right of return," or priority to any vacancies that recur at their former schools, if return will not upset the racial balance. App. III at 192a–93a.

---

* Hon. William W. Caldwell, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

1. These proportions are calculated separately for each of the three levels of compulsory public education, elementary, junior high and high school. App. at 119a–20a.

## B.

### Development of the Policy

 The Philadelphia School System has long suffered from *de facto* segregation by race of students and faculty. Under Pennsylvania law, school districts may take steps to rectify a racial imbalance that is the product of *de facto* segregation as well as of *de jure* origin. *Balsbaugh v. Rowland*, 447 Pa. 423, 438, 290 A.2d at 85, 93 (1972). Also, the state, through the agency of the Pennsylvania Human Relations Commission (PHRC), may require a plan to eliminate *de facto* racial imbalances in schools. 447 Pa. at 432–33, 290 A.2d at 90; *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A.2d 290 (1967).

In 1968, the PHRC began proceedings under state law to compel the elimination of racially identifiable schools in Philadelphia. *See School District v. Pennsylvania Human Relations Commission*, 6 Pa. Cmmw. 281, 294 A.2d 410 (1972), *aff'd as to other parties*, 455 Pa. 52, 313 A.2d 156 (1973), *(School District I)*; *Pennsylvania Human Relations Commission v. School District*, 23 Pa.Cmmw. 312, 352 A.2d 200 (1976) *(School District II)*; *Pennsylvania Human Relations Commission v. School District*, 30 Pa.Cmmw. 644, 374 A.2d 1014 (1977), *aff'd*, 480 Pa. 398, 390 A.2d 1238 (1978) *(School District III)*; *Pennsylvania Human Relations Commission v. School District*, 66 Pa.Cmmw. 154, 443 A.2d 1343 (1982) *(School District IV)*. The state courts have generally preferred to allow the School District to establish "voluntary" plans in response to prodding by the PHRC because, as the Pennsylvania Supreme Court noted, the School District has "primary responsibility for the choice and implementation of an effective desegregation program." *School District III*, 480 Pa. at 428, 390 A.2d at 1253 (quoting *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 181, 233 A.2d 290, 302 (1967)). The most recent

state court action resulted in a consent agreement for a desegregation plan involving use of "magnet" schools. Despite these lengthy proceedings, the students of the School District still attend racially identifiable schools. *See School District IV*, 66 Pa.Cmmw. at 174, 443 A.2d at 1352.

PHRC guidelines espouse integration of faculty as well as of students as a means to eliminate the racial identifiability of schools and to achieve equal education for their students. *See School District II*, 23 Pa. Cmmw. at 317, 352 A.2d at 203. In 1969, the PHRC entered into a consent decree with the School District that required each elementary school to have at least 20% and each secondary school to have at least 10% of both black and white teachers. App. II at 115a. This decree supplemented a policy imposed in 1965, and still continuing, of assigning newly hired teachers in a manner that furthers racial balance. Appellee teachers do not attack this race-conscious initial assignment, which they consider "reasonable". Brief for Appellees at 4–5. Assignment on this basis aided faculty integration when there was an upsurge in hiring but voluntary transfers were also restricted in an effort to reach the 20% and 10% goals. *Kromnick v. School District*, 555 F.Supp. at 250.

In 1978, the School District's teacher assignment policies were again rewritten, this time because of the requirements of the federal government. In order to receive financing to assist in desegregation, the School District applied for federal aid then available under the Emergency School Aid Act (ESAA) Title VI, § 601, 20 U.S.C. §§ 3191–3207 (Supp V. 1981) (repealed effective October 1, 1982).[2] The Office of Civil Rights (OCR), of the Department of Health, Education and Welfare denied the application because the School District's desegregation plan was unsatisfactory. Among the deficiencies cited was insufficient integration of classroom teachers.

**2.** The ESAA statutory grant program was repealed by Congress in August 1981, effective October 1982, as part of a general repeal of categorical grants-in-aid. Pub.L. 97–35, Title V, § 587(a)(1), 95 Stat. 480 (Aug. 13, 1981).

The then-applicable ESAA regulations administered by OCR provided:

> No educational agency shall be eligible for assistance under the Act if ... it has ... any practice, policy or procedure which results .in discrimination on the basis of race ... including the *assignment of full-time classroom teachers to the schools of such agency in such manner as to identify any of such schools as intended for students of a particular race,* color or national origin. .

45 C.F.R. § 185.43(b)(2) (1978) (emphasis added), redesignated 280.22(e) (1980) (repealed effective October 1, 1982). OCR found that teacher assignments in Philadelphia were "racially identifiable" despite the District's compliance with the numerical goals imposed under its consent decree with the PHRC.[3] In 1978 the School District's student population was 64.2% black, 6% Hispanic, and 31.6% white and its faculty was 63% white, 36% black and 1% other. OCR found that of 280 schools, 114 had 90% black students, whereas 60 schools had 80% white students. 61% of the black teachers were assigned to the schools with 90% black students, but only 8% were assigned to the schools with 80% white students. App. I at 58a–59a, 66a. OCR concluded that many schools that were racially identifiable by students had racially identifiable faculties and were "readily identifiable by the racial composition of their teaching staffs as intended for students of a particular race .... in violation of 45 C.F.R. 185.43(b)(2)." App. I at 59a.

OCR found that the District's teacher assignment policies had allowed too much choice of assignment for teachers in a system with *de facto* segregation. After intimating that this amounted to a conscious policy that might be unlawful or unconstitutional, the agency declined to revoke a determination of ineligibility, and concluded:

> [C]ompliance with the [PHRC consent decree] ... was not sufficient to overcome the persistent pattern of racial identification of schools by faculty assignment .... In fact, the district has continued to allow teacher choice to determine teaching assignments even though, as the district representatives admitted, residential areas in the city are *de facto* segregated and teachers tend to choose schools nearest to their homes. Thus, it is our view that the natural, probable and foreseeable result of your district's teacher assignment policies was to maintain the racial identifiability of schools by the composition of their teaching staffs.

Letter from Herman R. Goldberg to Dr. Michael P. Marcase (August 8, 1978), App. I at 71a.

ESAA regulations provided for a "waiver" of eligibility if the district undertook remedial action "so that the proportion of minority group full-time teachers at each school is between 75 percentum and 125 percentum of the proportion of such minority group teachers which exists on the faculty as a whole." 45 C.F.R. § 185.44(d)(3) (1978), redesignated 34 C.F.R. § 280.30(c) (1980), (repealed effective October 1, 1982). The School Board voted to comply with this 75%/125% standard, and adopted the policy described above, which went into effect immediately for the 1978–79 school year and has been continued for each year since. As a result, the School District received federal funds annually for desegregation.

## C.

*Procedural History and Continued Use of the Policy*

▪ Four white teachers transferred under the 75%/125% policy, Lorraine Krom-

---

**3.** OCR defined a school as "racially identifiable" for a school system with predominantly black enrollment. if 90% of students were black or 80% were white. Teacher assignments were considered racially identifiable if .black-identified schools had more than twice the systemwide percentage of black teachers or if white-identified schools had less than half the percentage of black teachers certified at a given level. Letter from Herman R. Goldberg, Associate Commissioner, Equal Education Opportunity Programs to Dr. Michael P. Marcase, Superintendent (June 22, 1978), App. I at 67a.

nick, Lorraine Brancato, Gladys Hirsh and Regina Katz, filed suit against the School District in December 1981, seeking declaratory and injunctive relief as well as money damages under the Constitution. Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1983. Plaintiffs contended that the policy was an impermissible racial classification, but did not argue that its impact fell disproportionately on whites or blacks as a group.[4]

The district court denied plaintiffs' motion for preliminary injunction primarily because the policy was mandated by OCR. *See Kromnick v. School District*, 555 F.Supp. 249, 252 (E.D.Pa.1983). The court then granted plaintiffs' motion for certification as representatives, for declaratory and injunctive relief, of a mixed-race class of teachers affected by the 75%/125% policy.[5] The court also directed the School District to determine if OCR continued to require use of the 75%/125% policy. *Id.* at 252.

On June 23, 1982, the Office of Civil Rights of the Department of Education, now responsible for the ESAA program, found the School District "substantially in compliance" with the regulations. The agency commended the system for integrating the faculty and stated that the district "is under no further obligation to continue to meet the 75%/125% standard." The agency also stated that "the district must continue to use nondiscriminatory policies" in placing teachers, and was "free to continue to maintain [the 75%/125% policy] if it so chooses." Letter from Frederick T. Cioffi, Director, Elementary and Secondary Education Division, Litigation, Enforce-

ment and Policy Service, Department of Education to Superintendent Michael Marcase (June 23, 1982), App. II at 74a–75a.

The School Board voted, on August 2, 1982, to continue using the 75%/125% policy for the upcoming school year. Although the Board made no specific findings as to the continued need for this particular policy and did not canvass alternative race-conscious policies, the Board heard a report by its personnel department, later confirmed in a written study, that if the 75%/125% policy were abandoned in favor of free choice in teacher assignments, the level of faculty integration would slip.

At the trial on plaintiffs' motion for permanent injunction, the plaintiff teachers dropped their contention that the plan was unlawful for the years 1978–82, and limited their claims to the new period of voluntary adherence. Brief for Appellees at 3 n. 2. The district court now held for plaintiffs, concluding that continued voluntary adherence to the 75%/125% policy violated the Equal Protection Clause of the United States Constitution and Title VII of the Civil Rights Act of 1964.

The court found that the policy's current purpose "is not to remedy past discrimination in teacher assignments, but to guard against the possibility that the system will revert to its pre-1978 level of racial imbalance in faculty assignments," and therefore termed the policy "an elective racial quota." 555 F.Supp. at 252. The court held that the School District had failed to show that the policy was substantially related to achievement of the legitimate and important objective of enhancing education-

---

4. Appellees suggested at oral argument before us that some evidence in the record would support a finding of disproportionate impact, but because this contention was never raised in the district court, we will not address it. *See United States v. Riccobene*, 709 F.2d 214, 229 (3d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir.1976); *see also Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

5. The class included:

All teachers employed by the defendants who have since August 1, 1978 been involuntarily transferred because of their race due to defendants maintenance of a racial quota system; all teachers employed by the defendants who, upon being involuntarily transferred since August 1, 1978 have been prevented from exercising seniority rights in selecting new schools because of the quota system; and all teachers who will in the future be involuntarily transferred or who will be prevented from exercising seniority rights in selecting new schools because of the quota system. 555 F.Supp. at 250 n. 1.

al opportunities for school children, because it had not demonstrated "through empirical evidence" the likelihood of reversion to prior levels of segregation, but had only presented "sheer speculation." *Id.* at 254. It held, moreover, that the School District had failed to demonstrate the unavailability of "nondiscriminatory alternatives for maintaining faculty integration." *Id.*

The court then distinguished cases from other circuits upholding such reassignment plans because in those cases the plans were remedial devices, whereas it viewed continued use of the 75%/125% policy as not remedial, but aimed at maintaining racial balance for its own sake. *Id.* The court held that continued use of the policy violated Title VII for essentially the same reasons as it violated the Constitution. *Id.* at 255–56. The court stated, "The salient and ultimately fatal characteristic of the District's quota system is that its only function is to preserve the existing racial percentages." *Id.* at 255. The policy "continues to allow race to be the sole criterion affecting employment once the desired end is actually met." *Id.*

The district court entered an order enjoining use of the 75%/125% policy as it applies to both phases of the transfer process.[6] The court initially granted only prospective relief "because of the District's good faith reliance upon the OCR determination ... that the District could continue its use of the 75%/125% standard," *id.* at 256; however, the court later granted plaintiffs' motion to amend the judgment and ordered that defendants restore those teachers transferred after August 1982 under the challenged policy.[7]

6. The Order provided:

> IT IS ORDERED that the School District of Philadelphia and the Board of Education ... is hereby *enjoined* from using the 75%/125% quota system as applied to involuntary transfers in selecting teachers to be involuntarily transferred and in restricting the selection rights of teachers required to be involuntarily transferred.

555 F.Supp. at 257.

The School District filed a timely appeal from this final order, and this court granted its motion to stay the district court's orders pending appeal. This court denied a motion to intervene by several parents of children enrolled in Philadelphia public schools, Barbara Jordan *et al.*, but allowed them to participate by briefing and oral argument as *amici curiae.* The PHRC submitted a brief as *amicus curiae* as did the Lawyer's Committee for Civil Rights Under Law and the Anti-Defamation League of B'nai B'rith, on behalf of itself and other ethnic organizations.

## II.

## EQUAL PROTECTION

■ The Supreme Court signalled the beginning of the end of institutionalized racism in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). As the Court later stated, "School boards ... were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968) (citations omitted). Congress joined in the Court's view of the invidiousness of racial discrimination and passed a series of laws, including the Civil Rights Act of 1964, outlawing discrimination in many areas. Racism, however, has not been eliminated, but the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution have been restored to their intended race-conscious and remedial function. "[N]o decision of [the Supreme] Court has ever adopted the proposition that the Constitution must be color blind." *Regents of the*

7. The amended order required that "defendants prior to making teacher assignments for the 1983–84 school year, restore to their former schools all teachers transferred from August 1982 to January 17, 1983 (1) who can establish that they would not have been transferred but for utilization of the 75/125 quota system, and (2) who file a right to return to their former schools with defendants no later than May 15, 1983." App. I at 25a (Order of Feb. 10, 1983).

*University of California v. Bakke,* 438 U.S. 265, 336, 98 S.Ct. 2733, 2771, 57 L.Ed.2d 750 (1978) (opinion of Brennan, J., joined by White, Marshall, and Blackmun, JJ.). Rather, experience has taught us that "[i]n order to get beyond racism, we must first take account of race." *Id.* at 407, 98 S.Ct. at 2807 (separate opinion of Blackmun, J.). *See also Williams v. City of New Orleans,* 729 F.2d 1554, 1573 (5th Cir.1984) (in banc) (Wisdom, J., concurring in part and dissenting in part).

In only two cases has the Supreme Court reached the merits of a party's contention that a governmental remedial program considering race as a factor violates the Equal Protection Clause of the Fourteenth Amendment.[8] In the first, *Regents of the University of California v. Bakke, supra,* decided in 1978, the Court's judgment was grounded on Title VI of the Civil Rights Act of 1964, which a majority of the Court viewed as coextensive with the Equal Protection Clause. The Court concluded that the University of California's preferential admissions program for student applicants from certain minority groups violated Title VI. The Court, however, also held that the state medical school should not be enjoined from according any consideration to race in its admissions process. 438 U.S. at 272, 98 S.Ct. at 2738. In the second, *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Court held that a provision of the Public Works Employment Act of 1977, requiring a set-aside of at least 10% of federal funds granted for local public works projects for purchases from minority-owned businesses, did not violate the Equal Protection Clause.

In *Bakke,* five Justices (the Chief Justice and Justices Stewart, Powell, Rehnquist, and Stevens) concluded that the preferential admission plan violated Title VI. Justice Powell was the only Justice who expressed the opinion that the plan was unconstitutional as well. Justices Brennan, White, Marshall, and Blackmun would have upheld the plan under both Title VI and the Constitution. In *Fullilove,* seven Justices concluded that a Congressionally enacted preference for minority contractors was constitutional, but did so under three separate opinions applying differing legal tests. Notwithstanding the differing views of the Justices, it is clear that a majority of the Supreme Court members have opined that not every race-conscious measure is constitutionally impermissible. Nothing in either of these cases impairs this court's earlier holding in *Porcelli v. Titus,* 431 F.2d 1254, 1257 (3d Cir.1970) (per curiam), *cert. denied,* 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1971), that "state action based partly on considerations of color, when color is not used per se, and in furtherance of a proper governmental objective, is not necessarily a violation of the Fourteenth Amendment."

The absence of an Opinion of the Court in either *Bakke* or *Fullilove* and the concomitant failure of the Court to articulate an analytic framework supporting the judgments makes the position of the lower federal courts considering the constitutionality of affirmative action programs somewhat vulnerable.[9] Nevertheless, it is necessary,

---

8. In three other cases presenting this issue, certiorari was granted, but the Court did not reach the merits. *See DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Minnick v. California Dept. of Corrections,* 452 U.S. 105, 101 S.Ct. 2211, 68 L.Ed.2d 706 (1981); *Boston Firefighters Union Local 718 v. Boston Chapter, NAACP,* 461 U.S. 477, 103 S.Ct. 2076, 76 L.Ed.2d 330 (1983). For some interesting academic comment on the avoidance of the merits in *DeFunis* and *Minnick; see* Mishkin, *The Uses of Ambivalence: Reflections on the Supreme Court and the Constitutionality of Affirmative Action,* 131 U.Pa.L.Rev. 907 (1983).

 Two additional cases addressed the propriety of race-conscious remedial classifications only

under Title VII. *See Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). We discuss these cases *infra* at III.

9. It is clear in other contexts, where the state has imposed racial classifications that are not designed to remedy the effects of past discrimination and therefore are more likely to reflect racial prejudice and to stigmatize, that the classifications "are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary ... to the accomplishment' of its legitimate purpose." *Pal-*

as a preliminary matter, to determine the level of scrutiny to be employed in reviewing a claim that state action violated the Equal Protection Clause.

In *Bakke*, Justices Brennan, White, Marshall, and Blackmun articulated a standard, similar to that developed in gender-discrimination cases, that "racial classifications designed to further remedial purposes must serve important governmental objectives and must be substantially related to achievement of those objectives." 438 U.S. at 359, 98 S.Ct. at 2783. Justice Powell, after distinguishing cases involving "remedies for clearly determined constitutional violations," *id.* at 300, 98 S.Ct. at 2753, viewed remedial classifications as "suspect," and justifiable only if the State "show[s] that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary ... to the accomplishment' of its purpose or the safeguarding of its interest." *Id.* at 305, 98 S.Ct. at 2756. The remaining Justices did not reach the constitutional issue in *Bakke*, and therefore did not comment on the level of scrutiny.

In *Fullilove*, Chief Justice Burger (joined by Justice White and by Justice Powell, who also drafted his own concurrence) declined to adopt a specific test in his opinion but held that the minority contracting program passed constitutional muster under either of the above tests. 448 U.S. at 492, 100 S.Ct. at 2781. Justice Marshall (joined by Justices Brennan and Blackmun) adhered to the intermediate test articulated by Justice Brennan in *Bakke*. *Id.* 448 U.S. at 519, 100 S.Ct. at 2795. Justice Stevens dissented in *Fullilove*, finding the program not "narrowly tailored," but without advocating a general theory applicable to remedial classifications. *Id.* 448 U.S. at 552, 100 S.Ct. at 2812. Justice Stewart, joined by Justice Rehnquist, dissented and advocated a color-blind position that barred preferences unless ordered by a court for the "sole purpose ... [of] eradicat[ing] the ac-

tual effects of illegal discrimination." *Id.* at 528, 100 S.Ct. at 2799.

The nature of the state action in this case is unique. In both *Bakke* and *Fullilove*, the governmental action imposed a preference based on race, which resulted in an undeniable detriment to members of the nonpreferred race. Thus in *Bakke*, the reservation of slots for minorities under the admissions plan created, as stated in Justice Powell's determinative opinion, "a line drawn on the basis of race and ethnic status" which meant that "white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants." 438 U.S. at 289, 98 S.Ct. at 2747. Similarly, in *Fullilove*, the 10% set aside for minorities concededly could "have the effect of awarding some contracts to MBE's which otherwise might be awarded to other businesses, who may themselves be innocent of any prior discriminatory actions." 448 U.S. at 484, 100 S.Ct. at 2777 (opinion of Burger, C.J.). Even in the context of these clear preferences, the members of the Court disagreed on the appropriate level of scrutiny, with some members opting for a strict scrutiny standard, while others stated that an intermediate standard was appropriate when the goal was remedial.

The 75%/125% program challenged in this action creates no preference of the type usually associated with claims of "reverse discrimination." There is no contention that teachers are either hired or laid off on the basis of race. There is no contention that teachers are promoted on the basis of race. There is no contention that any classification with any monetary significance is made on the basis of race. The challenge is to a policy that only affects assignment of teachers to schools. Ordinarily, this is a function within the exclusive prerogative of the school district, unless a collective bargaining agreement imposes restrictions. In this instance, however, the collective bargaining agreement incorporates the 75%/125% policy, and has

*more v. Sidotti*, ―― U.S. ――, ――, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (quoting

*McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964)).

done so year after year. Since the program is racially neutral, requiring the transfer of both black and white teachers, and there has been no showing of disparate impact upon one race, it is questionable whether the policy is one effecting a discrimination of constitutional dimension.

Indeed, there is an innate inconsistency in plaintiffs' position on this issue. Plaintiffs do not challenge the constitutionality of the school district's policy to assign teachers initially to schools in such manner as will integrate the school's faculty. Furthermore, they do not suggest that the policy limiting voluntary transfer on race considerations is constitutionally offensive. They suggest no basis, grounded in constitutional principles, why involuntary transfer of teachers, unlike these other unchallenged race-conscious strategies, involves a constitutional discrimination in the absence of a contractual right that is being overridden.

No case has suggested that the mere utilization of race as a factor, together with seniority, school need, and subject qualification, is prohibited. Since the classification is not preferential, it might most appropriately be reviewed for its rational relationship to a legitimate government objective, under which standard it would be patently valid. At most, since there is some element of racial classification, albeit not of preference, the appropriate level of scrutiny would be the intermediate level suggested by four members of the Court in *Bakke*, in which the classification was indeed preferential.

The appropriate question under that standard is whether the classification "serve[s] important governmental objectives" and is "substantially related to achievement of those objectives." *Bakke*, 438 U.S. at 359, 98 S.Ct. at 2783 (opinion of Brennan, J.). The School District articulates its goal as the integration of the faculties of the public schools of the City of Philadelphia so that public school pupils will have the opportunity to be taught by an integrated faculty. The district court agreed that "the governmental objective of maintaining desegregated school faculties in order to enhance the educational opportunities of the school children is indeed a legitimate and important objective." 555 F.Supp. at 254. It held, however, that the 75%/125% plan had not been shown to be "substantially related to achievement" of the objective. *Id.* It was in this regard that the district court erred. The evidence is unmistakable and unchallenged that during the period of the operation of the 75%/125% program, the goal of integrating faculties of the public schools was substantially furthered. *See, e.g.,* App. I at 75a.

Although the district court stated that it was applying an intermediate standard of review, it did not do so in fact since it imposed on the School District the burden to show by empirical evidence that the district would "revert back to prior levels of segregation" if the 75%/125% policy were not used, and that "other nondiscriminatory alternatives" could not be used for "maintaining faculty integration." 555 F.Supp. at 254. By imposing on the School District these requirements, the district court in fact was using a strict, indeed a most exacting, standard of scrutiny, one we conclude was inappropriate under these facts. In neither *Bakke* nor *Fullilove* did a majority of the Court hold that such a strict scrutiny standard was appropriate even when the racial classification imposed a preference. Thus, its use by the district court in this case cannot be sustained.

Furthermore, even if the intermediate standard of review applied above were not deemed apt, the result would be the same if we apply the more rigorous standard used to evaluate affirmative action programs under which members of minority groups are given a preference. In reviewing such a preference, Chief Justice Burger in *Fullilove* declined to select a particular standard of scrutiny and instead reviewed the racial classification against the underlying concerns common to the opinions previously expressed in *Bakke*. As an alternative holding, therefore, we adopt that course which was also utilized recently by Judge Kravitch in her opinion reviewing a chal-

lenge to a race-conscious affirmative action plan for county contracts in *South Florida Chapter v. Metropolitan Dade County,* 723 F.2d 846, 851–52 (11th Cir.1984).

The relevant factors that emerge from the Supreme Court opinions are (1) the importance and validity of the remedial aim, (2) the competence of the agency to choose such a remedy, and (3) the tailoring of the remedy so as to limit the burden suffered by others. We do not suggest that this list is complete, but rather believe that it provides a framework in which to determine whether this plan is permissible or entails unconstitutional racial discrimination.

### A.

### *Remedial Purpose*

One of the linchpins of appellees' argument is its contention that the 75%/125% policy serves no remedial purpose and that, as a result, the legal precedent supporting a more flexible scrutiny for remedial plans is inapplicable. It bases its argument on the district court's determination that the "purpose [of the policy] is to preserve the status quo and not to remedy past discreimination." 555 F.Supp. at 256. We believe the district court's narrow view of the parameters of a remedial purpose was erro-

neous as a matter of law, and that its finding that the 75%/125% policy in this case was not remedial was clear error.

The district court apparently believed that once the School District was relieved by the OCR in 1982 of the obligation to maintain the 75%/125% policy, its action in continuing that policy ceased to be remedial. The district court ignored the 15 year history of state proceedings against the School District, which are still pending in state court, directed to effecting integration of the Philadelphia public school system. The long history of Philadelphia public schools as "racially identifiable" as either "white schools" or "black schools" cannot be gainsaid. As early as 1969 the School District was operating under a consent decree entered into with the Pennsylvania Human Relations Commission requiring it to remove the racial imbalance among teachers in its schools.

The opinions of the Pennsylvania courts provide graphic evidence of the continuing efforts by the PHRC to require the School District to submit a plan that would be effective in eliminating racial imbalance in its schools, the submission of plans repeatedly held inadequate by the PHRC and the Commonwealth Court, and the failure, as yet, to reach the goal of racial balance.[10]

---

**10.** Following a 1972 decision rejecting the School District's contention that the PHRC lacked the authority to order it to submit a plan to achieve racial balance in its public schools, *School District I,* 6 Pa.Cmmw. 281, 294 A.2d 410, the PHRC ordered the School District to submit "a plan and timetable for implementation thereof that will eliminate racial imbalance [defined numerically as no more or less than 30% Negro pupils] in its schools." *See School District II,* 23 Pa.Cmmw. at 314, 352 A.2d at 201. The School District failed to submit such a plan and the PHRC obtained a Commonwealth Court order to require one by February 1974. *Id.* at 319, 352 A.2d at 204. The PHRC disapproved the plan that was submitted, involving busing and pairing, and filed a second petition for enforcement and for the appointment of a special master. A master was appointed, but his recommendations were opposed by both the School District and the PHRC. In October 1974, the Commonwealth Court ordered the parties each to submit proposed final plans. *Id.*

The 1976 decision of the Commonwealth Court on these plans found that "evidence in the

record compels the conclusion that there is racial imbalance in the Philadelphia schools which can be corrected," *School District II,* 23 Pa.Cmmw. at 331, 352 A.2d at 211, and stated that "improvement of the racial imbalance in the schools is necessary." 352 A.2d at 216. Because the Court found none of the submitted plans entirely satisfactory, it ordered the District to submit by July 1, 1976 a new "plan and timetable for the practical cure in its schools of conditions of racial imbalance...." *Id.* The court stated, "We expect and will require the District to make a realistic and effective proposal to integrate the schools." *Id.*

The new plan, "built around a new magnet school program," was approved by the Commonwealth Court for an interim test period, over the PHRC's objection that it was inadequate. *School District III,* 30 Pa.Cmmw. at 646, 374 A.2d at 1015. This conclusion was affirmed by the Pennsylvania Supreme Court, 480 Pa. 398, 390 A.2d 1238 (1978). After the trial period had passed, the PHRC argued that the voluntary plan was inadequate and in 1980 sought an order requiring a mandatory one.

In the context of repeated court and administrative orders to eliminate the racial identifiability of schools, the School District's plan to further this end by integrating faculty must be considered remedial as a vital part of the ongoing effort to achieve a unitary school system. Thus, the fact that the four year federal phase of this long history concluded in 1982 cannot signify an end to the remedial nature of efforts made toward this goal. In fact, at the time of the hearing before the district court, the School District was still obligated by court order to implement a desegregation plan that would "accomplish[ ] the desegregation of schools which contain all or nearly all black students." *School District IV,* 66 Pa.Cmmw. at 177, 443 A.2d at 1353.

Furthermore, because our society has not yet achieved full integration among its component races in important areas of public life, including housing, employment, and public education, a reasonable plan designed to foster racial balance of public schools' teachers must be considered as directed toward remedying still existent racism, even without an applicable court order or pending administrative proceeding.

In Philadelphia, as around the nation, many minority students live and attend school in racially isolated regions of the city. National experience strongly suggests that, as a result, these students' educational opportunities have been unnecessarily limited. Schools are great instruments in teaching social policy, for students learn not only from books, but from the images and experiences that surround them. One such lesson is of a spirit of tolerance and mutual benefit, a lesson that is more difficult to absorb when schools

attended by black students are taught by black teachers while schools attended by white students are taught by white teachers. As the Supreme Court recently noted in another context, "[Teachers] have direct, day-to-day contact with students, exercise unsupervised direction over them, act as role models and influence their students about the government and the political process." *Bernal v. Fainter,* —— U.S. ——, ——, 104 S.Ct. 2312, 2316–17, 81 L.Ed.2d 175 (1984).

The integration of faculty is a means to improve the quality of education of those who have suffered the effects of racial prejudice and segregation. *See generally* Report of the National Advisory Commission on Civil Disorders 237–45 (1968) (educational recommendations for the cities). "Proper integration of faculties is as important as proper integration of schools themselves." *Porcelli v. Titus,* 431 F.2d at 1257. As we stated in that case in upholding Newark's policy that preferred the promotion of minority teachers:

> We reaffirm the principle that faculty selection must remain for the broad and sensitive expertise of the School Board and its officials .... The question thus becomes, when is there such faculty distribution as to provide equal opportunities to all students and to all teachers—whether white or Negro? Students in each school should have the same quality of instruction as in any other school.

*Id.* at 1257 (quoting *Kemp v. Beasley,* 389 F.2d 178, 189–90 (8th Cir.1968)).

The integration of faculty has long been recognized as an appropriate remedy for the effects of *de jure* segregation. *See United States v. Montgomery County Board of Education,* 395 U.S. 225, 235–36,

The Commonwealth Court agreed with the PHRC and found: "Thus today as in 1977 over two-thirds of all the black public school students in Philadelphia attend scools that are racially isolated containing proportions of black students in excess of 90%." *School District IV,* 66 Pa.Cmmw. at 174, 443 A.2d at 1352. The court reemphasized that "a fundamental purpose of any well-conceived desegregation effort must be to desegregate the identifiably black schools in the district and to diminish to the extent possi-

ble the racial isolation of black public school students." *Id.* at 176, 443 A.2d at 1353. The court ordered the School District to modify its plan "to correct racial imbalance" and to consider seriously such mandatory remedies as pairing of schools and race-conscious reassignment of students from closed schools. *Id.* at 180, 443 A.2d at 1355. We are informed by the parties that in 1983 they entered into a consent decree to implement the order of the Commonwealth Court.

89 S.Ct. 1670, 1675–76, 23 L.Ed.2d 263 (1969); *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1217–18 (5th Cir.) (in banc) (per curiam), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 698 (1970), *cert. granted and rev'd in part on other grounds, Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970); *United States v. Jefferson County Board of Education*, 372 F.2d 836, 895 (5th Cir. 1966), *aff'd in banc*, 380 F.2d 385, *cert. denied sub nom. Caddo Parish School Board v. United States*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

Faculty integration is also an appropriate remedy for a system that has suffered *de facto* segregation. Congress adopted this view in enacting the funding limitations of the Emergency School Aid Act, which applied to *de facto* segregated systems in the North the same requirements as had prevailed through court orders entered as to *de jure* segregated systems in the South. *See Board of Education v. Harris*, 444 U.S. 130, 142–44, 100 S.Ct. 363, 370–371, 62 L.Ed.2d 275 (1978) (construing the Act to operate against *de facto* segregation). It was this national policy against the effects of *de facto* segregation that caused OCR to hold Philadelphia ineligible for certain federal funds under the ESAA. The policy is no less important now that the School District operates free of federal compulsion.

Two circuits, affirming the importance of this voluntary goal, have upheld race-conscious assignment policies similar to Philadelphia's. *See Zaslawsky v. Board of Education*, 610 F.2d 661 (9th Cir.1979) (upholding continued use of race-conscious faculty assignments after OCR no longer required it); *Caulfield v. Board of Education*, 632 F.2d 999 (2d Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) (affirming use of "voluntary" plan developed at OCR's urging to hire and transfer teachers to attain faculty integration). The district court distinguished these cases on the ground that, unlike in those cases, the Philadelphia School District's policy was not remedial or that its remedial purpose had been achieved. For the reasons set forth above, we find this distinction unpersuasive. Until the Philadelphia school system achieves racial balance as to students as well as faculty, the ultimate goal of improved educational opportunity through racial diversity cannot be attained. On this record, we believe the remedial nature of the 75%/125% policy is clear.

## B.

### Institutional Competence

A second consistent theme of the Supreme Court opinions is concern for the competence of the agency to choose a race-conscious remedy. The opinions of Chief Justice Burger and Justice Powell in *Fullilove* strongly emphasized the special competence of Congress in upholding the minority contractor legislation. *See* 448 U.S. 483–84, 490–91, 100 S.Ct. 2780–81 (opinion of Burger, C.J.); *id.* at 500–03, 519, 100 S.Ct. at 2786–87, 2795 (opinion of Powell, J.).

These opinions do not imply that only Congress is competent to choose race-conscious remedies. *See, e.g., South Florida Chapter v. Metropolitan Dade County*, 723 F.2d at 852 (county commission); *Ohio Contractors Association v. Keip*, 713 F.2d 167, 171–73 (6th Cir.1983) (Ohio General Assembly); *Detroit Police Officers' Association v. Young*, 608 F.2d 671, 694 (6th Cir.1979), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981) (Board of Police Commissioners). *See also United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (upholding race-conscious New York reapportionment law).

Patently, a school district is competent to choose a race-conscious teacher assignment policy to further educational goals. Although Justice Powell in *Bakke* reasoned that the University of California lacked competence to discern and remedy *societal* discrimination that might have affected the stream of would-be doctors, 438 U.S. at 307–09, 98 S.Ct. at 2757, we do not read that opinion as in derogation of the Su-

preme Court opinions containing broad language affirming the special competence of school districts to adopt race conscious remedies. *See, e.g., McDaniel v. Barresi,* 402 U.S. 39, 41–42, 91 S.Ct. 1287, 1288–1289, 28 L.Ed.2d 582 (1971). As the Court stated in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) (*Swann I*):

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.

Moreover, the Court has several times held unconstitutional measures that would have limited a school system's power to choose race-conscious remedies. *See Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (initiative prohibiting school district's use of busing); *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) (*Swann II*) (law forbidding race-conscious busing is infringement on school authorities' "wide discretion" to formulate policy to achieve racial balance). The Court has consistently supported a school system's affirmative duty and discretion to take steps to remedy racial imbalance, a view that perforce applies to a policy of faculty integration. *See Zaslawsky v. Board of Education,* 610 F.2d at 661; *Porcelli v. Titus,* 431 F.2d 1257.

### C.

#### Matching Ends and Means

The final factor to be considered under this mixed factor review is whether the plan, as continued by the School District, extends further than the established need. Appellees' primary contention, and one concurred in by the district court, is that the

School District failed to show that less restrictive policies would not assure a sufficient level of integration. No Supreme Court opinion has required a competent agency to undergo a canvassing of alternatives as a constitutional prerequisite for a legitimate remedial action. The various opinions in *Fullilove* either expressly reject any requirement that the remedy chosen be the least restrictive, *see Fullilove,* 448 U.S. at 508, 100 S.Ct. at 2790 ("[T]his Court has not required remedial plans to be limited to the least restrictive means of implementation") (opinion of Powell, J.), or adopt a far less rigorous standard. *See id.* at 520–21, 100 S.Ct. at 2796 ("the means chosen ... are substantially related to the achievement of its remedial purpose") (opinion of Marshall, J.), *id.* at 490, 100 S.Ct. at 2780 (Congress must proceed "only with programs narrowly tailored to achieve its objectives") (opinion of Burger, C.J.). *See also Ohio Contractors Association v. Keip,* 713 F.2d 167, 174 (6th Cir.1983).

In examining the means we look first to the impact of the means chosen by the School District. The School District's plan requires some teachers of both races, primarily if not exclusively those with little seniority, to bear the burden of transfers and of diminished choice upon transfer. The transferred teachers retain jobs with the School District and retain accumulated seniority at their new schools. They also retain some exercise of choice of schools when it would not conflict with the 75%/125% policy and may return to their former schools in subsequent years. Moreover, the number of teachers affected has been comparatively small in recent years. In the latest year of operation, only approximately 50 to 60 of 11,000 teachers in the system were involuntarily transferred from their former schools because of the 75%/125% policy. The vast number of teachers are transferred for other reasons, primarily changes in the numbers of students attending the school.

There is no evidence before us that the impact of the 75%/125% policy falls more heavily on one race than another and the

record does not suggest that the plan imposes a great risk of stigmatizing or stereotyping racial groups or of reinforcing racist views. When compared to the effect on non-preferred groups by the contractor set-aside provision upheld in *Fullilove*, it cannot be said that the School District's policy imposes an undue burden on those teachers whose voluntary choice of school assignment is limited by the plan. Furthermore, we find it instructive that plaintiff teachers suggest as a preferable alternative to the 75%/125% plan a program under which "the School District could eliminate free choice by involuntarily transferred teachers entirely." Brief for Appellees at 49. This reinforces our conclusion that the restriction on the free choice of assignments by the School District under the plan it maintains does not impose an impermissible burden.

We deem it of some significance that the School District's plan does not impose a firm quota analogous to the 16 reserved seats in *Bakke*. Concern about and abhorrence to such fixed quotas, particularly by groups that have historically been deprived of opportunities as a result, is understandable. Although the 75%/125% ratio is indeed numerical, we view it as more flexible, since it provides a wide range of 50% within which the racial composition of a particular school's faculty may diverge from the racial proportion of teachers along the school system's lines.

Appellees assert that the 75%/125% ratios are impermissibly arbitrary choices. The fact that the ratio emanated from a federal agency that had oversight in this area tempers to some extent the inherent arbitrariness of the numerical target chosen. We recognize the force to appellees' contention that the School District could achieve its remedial end and yet allow some slippage from the 75%/125% ratios. Nevertheless, some flexibility must be afforded the School District to determine the scope of the remedy. The School District has had long experience with prior plans involving a greater range of choice in teacher placement that failed to achieve integration of faculty.

Murray Bookbinder, Executive Director of Personnel and Labor Relations for the School District, testified that he advised the School Board that in the absence of the 75%/125% policy, there would soon be a reversion to earlier levels of racial polarization of faculty. Tr. at 1–30; App. II at 125a. Because of limited open positions in the system, Tr. at 1–36, use of race-conscious assignments and voluntary transfers would not have been an adequate alternative. Herbert Kauffman, Director of Teacher Placement, persuasively demonstrated that increasing the range of teacher choice would most likely result in white teachers choosing white schools and black teachers choosing black schools. App. III at 168a–69a, 174a–75a. That was also the view of OCR, which had premised its 75%/125% requirement on that basis. *See* App. I at 71a. The district court's characterization of the School Board's concern about reversion to prior levels of segregation as "sheer speculation" is clearly erroneous. Under the facts before it, and in light of the totality of circumstances known to it, the School Board could reasonably decide to continue in effect a policy that had successfully achieved racial balance among its teachers.

None of the alternatives urged by appellees, such as the combined use of different numbers, the addition of discretionary flexibility in staffing each school, the encouragement of voluntary race-conscious transfers, and/or the continued use of race-conscious initial assignments, offers a clearly superior and effective alternative to the one selected by the School District.

We express no opinion as to whether continued application of the 75%/125% plan would create an unconstitutional discrimination if there is a substantial change in facts. Certainly it would be troubling if the School District failed to reconsider periodically the need for this policy. We conclude only that on the basis of the record before us its decision to continue use of the "narrowly tailored" 75%/125% plan after June 23, 1982 was supported by a legiti-

mate remedial purpose, and that the district court's holding that maintenance of the policy after that date violated the Constitution cannot stand.

### III.

### *ANALYSIS UNDER TITLE VII*

The district court concluded that the School District's voluntary continued use of the 75%/125% policy violated section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). That section provides:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as employee, because of such individual's race, color, religion, sex, or national origin.

The scope of Title VII is broader than that of the Constitution. *See Washington v. Davis,* 426 U.S. 229, 238–39, 247, 96 S.Ct. 2040, 2046–47, 2051, 48 L.Ed.2d 597 (1976). Otherwise, of course, there would have been no need to make the statute's provisions applicable to public employees. Therefore, the reservation we expressed *supra* about applying the Equal Protection Clause to a race-conscious strategy that establishes no preference is not applicable to Title VII.

On the plain language of the statute, we agree with the district court's conclusion, not contested by the School District on appeal, that the expectation of maintaining seniority at a school and the placement of teachers in new schools by reassignment may fairly be considered to constitute "terms, conditions, or privileges of employment" protected under subsection (a)(1).

■ It is clear that Title VII prohibits discrimination against both whites and blacks, *see McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 278–85, 96 S.Ct. 2574, 2577–2581, 49 L.Ed.2d 493 (1976), and protects the individual from discrimination limiting employment opportunities even if the individual's group has not suffered from discrimination on the "bottom line". *See Connecticut v. Teal,* 457 U.S. 440, 451, 453–56, 102 S.Ct. 2525, 2533, 2534–36 (1982). "The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole." *Id.* at 453–54, 102 S.Ct. at 2531–35. Based on these precepts, we conclude that policies such as the School District's come within the literal language of Title VII.

■ The Courts of Appeals, including this court, have been unanimous in concluding that Title VII, like the equal protection clause, does not forbid race-conscious remedial action. *See Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, —— & n. 10, 104 S.Ct. 2576, 2587 & n. 10, 81 L.Ed.2d 483 (1984) (describing cases) (Blackmun, J., dissenting); *EEOC v. American Telephone & Telegraph Co.,* 556 F.2d 167, 174–77 & n. 5 (3d Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *Contractors Association v. Secretary of Labor,* 442 F.2d 159, 172–74 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). As the Supreme Court has instructed in *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the language of Title VII must be read against the broad remedial purposes envisioned by Congress in passing the Act. The Court there upheld an employer's voluntary use of a racial promotional quota as a reasonable measure "to abolish traditional patterns of racial segregation and hierarchy." 443 U.S. at 204, 99 S.Ct. at 2727. It construed Title VII as leaving employers and unions in the private sector "free to take such race-conscious steps to eliminate manifest racial imbalanc-

es in traditionally segregated job categories." *Id.* at 197, 99 S.Ct. at 2724. This court adopted a similar view of Congressional intent in the *Contractors Association* case, in which we upheld an executive plan to favor minority contractors. We stated,

> To read § 703(a) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history.

442 F.2d at 173.

A similar approach is appropriate for classifications designed to achieve faculty integration for the benefit of the *students* of a segregated school system. Congress enacted Title VII, and in 1972 expanded its coverage to include employees of previously exempted state educational institutions, at a time when there was national focus on the need to continue efforts to desegregate educational facilities. *See generally,* United States Commission on Civil Rights, Fulfilling the Letter and Spirit of the Law, Desegregation of the Nation's Public Schools, 122–28 (1976) (reviewing cases and the continuing need for integration of staff). Race-conscious faculty reassignment was a commonly ordered remedy in litigation challenging such segregation. *See, e.g., Singleton v. Jackson Municipal Separate School District,* 419 F.2d at 1218, and cases cited *supra* at IIA. Had Congress, when it expanded Title VII in 1972, intended to foreclose such a remedy, it would have so indicated. Instead the legislative history of that statute shows special concern for improving the education of students through diversified staff. The Senate Report states:

> It is difficult to imagine a more sensitive area than educational institutions, where the youth of the Nation are exposed to a multitude of ideas and impressions that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote existing misconceptions and stereotypical categorizations which in turn would lead to future patterns of discrimination.

S.Rep. No. 415, 92d Cong., 1st Sess. 12 (1971); *see also* H.Rep. No. 92–238, 92d Cong. 1st Sess. 17–20, *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2153–54 (special importance of remedying highly visible discrimination in public education).

Congressional recognition of the importance of integrated faculty was reiterated in passage of the Emergency School Aid Act, 20 U.S.C. §§ 3191–3207 (Supp.V.1981) (repealed 1982), a primary purpose of which, according to the Supreme Court, was "to encourage 'the voluntary elimination, reduction or prevention of minority group isolation'" in public schools, including the racial isolation of faculties. *Board of Education v. Harris,* 444 U.S. 130, 132–33, 100 S.Ct. 363, 365, 62 L.Ed.2d 275 (1979).

 Thus although a classification that is overtly race-conscious might under ordinary circumstances signify a per se violation of Title VII, applying a per se analysis to voluntary policies of staff integration designed to further the education of students of *de facto* segregated public school systems would be inconsistent with the intent of Congress underlying Title VII. Because the 75%/125% policy is not a per se violation of Title VII, we must turn to the traditional framework to analyze whether it entails disparate treatment stemming from discriminatory intent, *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–1855 n. 15, 52 L.Ed.2d 396 (1977), or whether it has a disparate impact on teachers of one race. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). As we previously stated, there has been no showing of disparate impact in this case. Thus, we need not even reach the issue presented in *Weber,* where the impact of the affirmative action plan on nonminority workers was evident.

Although the district court did not articulate its holding that the 75%/125% policy violates Title VII in terms of the disparate treatment line of cases, it appeared to so classify it since it relied on its finding that the policy was not remedial. As we concluded in our Equal Protection discussion, *supra* IIA, we believe this record belies that finding. Thus, even if there were disparate treatment by races, which is questionable, the clearly remedial intent underlying the School Board's determination to continue the 75%/125% policy in effect vitiates any disparate treatment claim.

The facts in this case are distinguishable from those before the Court in its recent opinion in *Firefighters Local Union No. 1784 v. Stotts*, —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). There, the Supreme Court held that Title VII, and in particular section 703(h), barred a district court from ordering that layoffs be made so as to retain black hirees who had been the beneficiaries of a prior remedial consent decree that did not itself limit seniority rights. Section 703(h), on which the Supreme Court relied and which protects bona fide seniority systems that are not the result of an intent to discriminate, is inapplicable here because the two central parties to the seniority plan, the School District and the Union, incorporated the 75%/125% policy in their collective bargaining contract, thereby agreeing that certain perquisites of seniority are to be qualified by that policy. Unlike *Stotts*, there is here no override of a bona fide seniority plan, and no requirement of race-conscious layoffs. Thus, we need not decide the issue explicitly left open by the Supreme Court in *Stotts* of whether a voluntary decision by the city to favor minorities in breach of a seniority plan would violate Title VII. *Stotts*, —— U.S. at ——, 104 S.Ct. at 2590–91.

Finally, the district court concluded that the policy could not be sustained because it was inconsistent with two criteria announced in *Weber*, that a plan should not "unnecessarily trammel" the interest of any employees and should be "temporary" in duration. 555 F.Supp. at 255–56. *See Weber*, 443 U.S. at 208, 99 S.Ct. at 2729. As we have previously concluded, the School District's transfer policy does not "unnecessarily trammel" the rights of reassigned teachers. Compared to permissible remedies chosen for desegregation, the transfer of teachers to other schools is a moderate and effective means. The 75%/125% plan achieves faculty integration in Philadelphia without overtly preferring one race over another, creating a racial impediment to advancement, or depriving employees of an attained rank. We agree with the Second Circuit which held that a similar policy does not violate Title VII. *See Caulfield v. Board of Education*, 632 F.2d 999 (2d Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

■ Nonetheless, in considering any affirmative action plan designed to be remedial, the courts must not overlook the caution expressed in Justice Brennan's opinion for the Court in *Weber* that the plan be "a temporary measure", 443 U.S. at 208, 99 S.Ct. at 2729. The district court correctly stated that Title VII requires that a race-conscious plan cease "once the desired end is actually met." 555 F.Supp. at 255. Our disagreement with the court is with its conclusion that the end had been already met by the numerical integration of faculty. This was not the end, but a means to improve education and to undo the effects of past societal discrimination felt by minority students in a segregated system. There is no evidence that this latter end has been achieved, or that it would not be undermined by a reversion to racially identifiable faculties.

We do not suggest that the School District may indefinitely operate a strict numerical transfer system. However, there is no indication in the record that the policy was intended to be permanent. Its continuation by the District in 1982 to meet a continuing need was not inconsistent with *Weber's* caution that such plans be "temporary." The School District will undoubted-

**912**

ly periodically reappraise the need for the policy. It is a formal part of the District's collective-bargaining agreement, which is subject to biennial renegotiation, and the plan operates in annual cycles, allowing for reevaluation of its continued ·necessity. Furthermore, the continuing proceedings before the state courts will afford an opportunity for reconsideration of the plan in light of the overall effort to eliminate racially identifiable schools in the school system. We hold only that the district court erred in finding a violation of Title VII on this record.

IV.

CONCLUSION

For the reasons set forth above, we will reverse the judgment of the district court enjoining use by the School District of Philadelphia of its 75%/125% policy for transfer and reassignment of faculty members.