Theodore Whitmore STANLEY, Jesse Barber, Joyce Franklin, J.W. Mack, et al., Plaintiffs,

United States of America, Intervenor–Plaintiff,

v.

DARLINGTON COUNTY SCHOOL DISTRICT, a Public Body Corporate; The State of South Carolina; The Department of Education for the State of South Carolina; the Board of Education for the State of South Carolina; William P. Beckham, III, In Official Capacity as Member of the State Board of Education; Samuel M. Greer, In Official Capacity as Member of the State Board of Education; Joseph Peeler Stabler, Colonel, In Official Capacity as Member of the State Board of Education; Cleveland L. Sellars, In Official Capacity as Member of the State Board of Education; Austin Floyd, In Official Capacity as Member of the State Board of Education; Julian B. Wright, In Official Capacity as Member of the State Board of Education; Brenda K. Vernon, In Official Capacity as Member of the State Board of Education; Earl Bostick, Sr., In Official Capacity as Member of the State Board of Education; Maxie Duke, In Official Capacity as Member of the State Board of Education; Laura M. Fleming, In Official Capacity as Member of the State Board of Education; Frank M. Hart, In Official Capacity as Member of the State Board of Education; Beth Pinson, In Official Capacity as Member of the State Board of Education; W. Gregory Horton, In Official Capacity as Member of the State Board of Education; Robert W. Owen, In Official Capacity as Member of the State Board of Education; Ruby Matthews, In Official Capacity as Member of the State Board of Education; Celia Gettys, In Official Capacity as Member of the State Board of Education; Thomas E. McInville, In Official Capacity as Member of the State Board of Education; David M. Beasley, in his Official Capacity as Governor of the State of

South Carolina and as Chairman of the State Budget and Control Board; and Barbara S. Nielsen, in her Official Capacity as State Superintendent of Education for the State of South Carolina; The State Budget and Control Board for the State of South Carolina; Grady L. Patterson, Jr., Earle E. Morris, James M. Waddell, Jr., and William D. Boan, In Their Official Capacities as Members of the State Budget and Control Board for the State of South Carolina, Defendants.

DARLINGTON COUNTY SCHOOL DISTRICT, Cross–Claimant,

v.

The STATE OF SOUTH CAROLINA; the Department of Education for State of South Carolina; William P. Beckman, III, In Official Capacity as Member of the State Board of Education; Samuel M. Greer, In Official Capacity as Member of the State Board of Education; Joseph Peeler Stabler, Colonel, In Official Capacity as Member of the State Board of Education; Cleveland L. Sellars; In Official Capacity as Member of the State Board of Education; Austin Floyd, In Official Capacity as Member of the State Board of Education; Julian B. Wright, In Official Capacity as Member of the State Board of Education; Brenda K. Vernon, In Official Capacity as Member of the State Board of Education; Earl Bostick, Sr., In Official Capacity as Member of the State Board of Education; Maxie Duke, In Official Capacity as Member of the State Board of Education; Laura M. Fleming, In Official Capacity as Member of the State Board of Education; Frank M. Hart, In Official Capacity as Member of the State Board of Education; Beth Pinson, In Official Capacity as Member of the State Board of Education; W. Gregory Horton, In Official Capacity as Member of the State Board of Education; Ruby Matthews, In Official Capacity as Member of the State Board of Education; Robert W. Owen, In Official Capacity as Member of the State Board of Education; Celia Gettys, In Official Capacity as Member of the State Board of Education; Thomas E. McInville, In Official Capacity as Member of the State Board of Education; David M. Beasley, in his Official Capacity as Governor of the State of South Carolina and as Chairman of the State Budget and Control Board; Barbara S. Nielsen, in her Official Capacity as State Superintendent of Education for the State of South Carolina, Cross–Defendants.

Civil A. No. 4:62–7749–22.

United States District Court,
D. South Carolina,
Florence Division.

Feb. 22, 1996.

Gary Haugen, Michael S. Maurer, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

Dennis D. Parker, N.A.A.C.P. Legal Defense and Educational Fund, Inc., New York City, Arthur C. McFarland, Charleston, SC, for class plaintiffs.

State of S.C., J. Emory Smith, Jr., Office of Atty. Gen., Columbia, SC, for State of S.C. and all State defendants except State Dept. of Educ.

George C. Leventis, Office of General Counsel, Columbia, SC, for State of S.C. Dept. of Educ.

John M. Milling, Darlington, SC, Alfred A. Lindseth, Sutherland, Asbill and Brennan, Atlanta, GA, for defendant, Darlington County School Dist.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CURRIE, District Judge.

### I. *BACKGROUND*

On June 3, 1994, the parties entered into a Consent Order stipulating, among other things, that Mayo High School was a racially identifiable school and a vestige of the prior dual school system in the Darlington County School District and that remedial measures were needed. Consent Order at 2 (6/3/94). Under the Consent Order, Mayo and St. John's High Schools were to be consolidated on the St. John's campus into Darlington High School beginning with the 1995–96 school year. After a two-week trial on the question of the future status of Mayo High School, this court, on June 23, 1994, issued a preliminary order finding that "(1) a desegregation remedy which simply closes the Mayo High School facility places a disproportionate share of the burden of desegregation on the black community; and (2) the most appropriate manner in which to share the burdens of desegregation and to remedy the racial stigma suffered by the Mayo community is to establish a county-wide, dedicated magnet school for grades nine through twelve at the Mayo High School to be named 'Mayo School.'" Order at 1–2 (6/23/94).[1]

On March 1, 1995, this court set forth detailed findings of fact and conclusions of law, holding in part that the District had engaged in widespread discriminatory activities against the Mayo community and had "stigmatized Mayo as an inferior black school." *Stanley and United States v. Darlington County Sch. Dist.,* 879 F.Supp. 1341, 1377 (D.S.C.1995). This court found, for example, that the District had "carved out an exception to its own attendance zone lines" to allow white children in the Country Club area to avoid the Mayo attendance zone, *id.* at 1375–76; failed to enforce its own attendance zone lines, particularly for white students attempting to avoid historically black schools, *id.* at 1376–77; assigned a disproportionate number of black teachers, administrators and support staff to Mayo, *id.* at 1381–

---

1. At trial, the court also considered whether the State of South Carolina should be required to bear any costs for remedying any constitutional violations found.

82; assigned a disproportionate number of less competent or problem teachers to Mayo, *id.* at 1381; allowed "dramatic deterioration" in Mayo's physical plant, *id.* at 1375; failed to provide adequate and comparable resources for Mayo (computers, textbooks, and library materials), *id.* at 1375, 1377–79; at times failed to provide Mayo students the same curriculum offered to other District high school students, *id.* at 1379–81; and at times failed to provide basic maintenance needs for Mayo, *id.* at 1377.

This court then fashioned a remedy to redress these specific constitutional violations, ordering the District to implement a dedicated magnet program at the Mayo facility, "to be named 'Mayo School', to further desegregate the District, remedy past stigma and injury, and equitably distribute the burdens of desegregation." *Id.* at 1389. This court noted that the magnet school "will be just one tool used to remove the vestiges of the dual system in Darlington County, and will supplement the other remedial measures set forth in the [June 3, 1994] Consent Order. . . ." *Id.*

There was no appeal filed from this court's order requiring the District to establish a magnet school at Mayo.[2] Thus, the parties agree that a magnet school is to be established for the purposes of further desegregating the District, remedying past stigma and injury, and equitably distributing the burdens of desegregation.

In keeping with these goals, this court ordered the District to file "a magnet proposal, including but not limited to . . . projected enrollment, by race and area of residence; . . . . [and] proposed criteria for selection to the magnet program that insure that selections will not have a disparate impact on black students or on the desegregation of the county's other high schools. . . ." *Id.* This court further ordered that the District file, among other things, data showing the race and residence area of every participating student; the number of applicants, by race and

residence area; and the selection criteria and results. *Id.* at 1390.

At a hearing held April 27, 1995, on the District's motion to delay implementation of the magnet school for one year, this court reiterated the need for and purpose of the magnet school. This court stated that the magnet is intended "to remedy the stigma that has been caused by the many years of action and inaction that has been suffered by Mayo." TR at 8, 20 (4/27/95). At the same hearing, counsel for the United States stated that the District's proposed selection criteria that were to be submitted to the U.S. Department of Education had only recently been provided to counsel and that more time would be needed to review them. The United States wished to insure that the selection criteria served to remedy the unlawful discrimination found by this court. After suggesting some minor modifications, the United States subsequently approved the District's proposed selection and admission process that included, as stated in the proposal, a 50/50 student racial composition requirement [hereinafter "District's 50/50 plan"] and a reservation of ten seats per grade level for students from the former Mayo attendance zone.

At a meeting on September 11, 1995, however, the Darlington County School Board voted to implement a revised enrollment process. The revised selection and admission criteria were submitted to the court and the parties on September 18, 1995. The United States and plaintiffs argue that the revised plan fails to provide for a desegregated student body at the magnet school and eliminates the dedicated seats for students from the Mayo attendance zone.

Pursuant to a telephone conference with all counsel, this court ordered an evidentiary hearing to address the United States' objections to the revised student selection and admission criteria and other concerns regarding the implementation of a dedicated magnet program at Mayo. This court held a two-day evidentiary hearing on October 12–

2. The State of South Carolina has appealed this court's ruling that the State must contribute 15% of the cost of desegregation in Darlington County and 100% of the transportation costs. The District cross-appealed, contending that the State should bear a larger proportion of the costs associated with remedying the constitutional violations.

13, 1995. At the conclusion of the hearing, the court made certain findings, issued an oral ruling declining to approve the revised selection and admission criteria, and established court-ordered procedures for implementation of the Mayo magnet. Thereafter, on October 24, 1995, the court issued an Interim Order containing the procedures to be utilized. Pursuant to Rule 52, Fed.R.Civ. P., the court now makes the following additional findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## II.  *FINDINGS OF FACT*

Dr. John Hudgens is a private educational consultant employed by the State Department of Education who is responsible for, among other tasks, providing technical assistance to the Darlington County School District regarding the Mayo Magnet School. Dr. Hudgens worked in the South Carolina Public School System for 34 years as a math teacher, elementary school principal, high school principal, associate superintendent and superintendent of the Richland School District 2 for nine years. Dr. Hudgens served as a member of the Mayo Magnet Task Force and attended most, if not all, of the meetings. He was also responsible for setting up visits to magnet programs in Charlotte, North Carolina. TR at 68, lines 11–21; 70, lines 1–8.

Dr. Lorraine Harris Knight became the coordinator of the magnet school implementation effort in October 1994, and was appointed principal of the Mayo High School for Math, Science and Technology in the Darlington County School District in March 1995. Dr. Knight visited six or seven successful magnet schools in Georgia and South Carolina, spoke to numerous experts around the country, and conducted extensive magnet school research in her efforts to create a selection and enrollment process that furthered the District's desegregation goals and to create an exemplary magnet program. Prior to becoming principal, Dr. Knight was the District Coordinator for Math and Science Programs for Secondary Schools for two and one-half years. TR at 70, lines 11–25 (Bates); 93, lines 5–9 (Knight); Knight Dep. at 2, lines 4–6; 3, lines 19–25; 4, lines 1, 8–12; 61, line 8–25; 65, lines 19–25; 66, lines 5–13.

Dr. Percy Bates was hired by the District as a consultant to provide technical assistance in establishing the magnet school and in complying with the court's desegregation order. Dr. Bates is a Professor of Educational Psychology and the Director of the Desegregation Assistance Center at the University of Michigan. Dr. Bates holds a Doctorate in Special Education and Educational Psychology from the University of Michigan, a Master's degree from Wayne State University, and a B.A. from Central Michigan University in Biology and Sociology. As the Director of the Desegregation Assistance Center for the last eight years, Dr. Bates has provided technical assistance to numerous magnet school programs around the country. TR at 175, lines 4–21; 176, lines 15–22.

Mr. Winston McElveen was elected to the Darlington County School Board in the fall of 1994, and represents Hartsville District 6. TR at 192, 20–25; 193, lines 1–3.

Mr. Dan G. Askins was elected to the Darlington County School Board in November 1994, and represents Hartsville District 7. TR at 222, lines 16–25.

Mr. C.W. Crowley was elected to the Darlington County School Board in January 1995, and he represents Hartsville. TR at 256, line 23; 257, lines 11–12.

Dr. William M. Gordon testified as an expert in school desegregation during the trial conducted in this case from May 23, 1994 to June 3, 1994. Dr. Gordon, a native of South Carolina, is a Professor of Educational Leadership at Wright State University in Dayton, Ohio, where he teaches graduate level courses in school administration, school supervision, school law, and curriculum. Dr. Gordon holds a B.A. in Finance and Banking and a Master's degree in Remedial and Diagnostic Education, both from Miami University in Oxford, Ohio. Dr. Gordon also holds a Doctorate in Secondary School Education, Curriculum and Administration from Indiana University, as well as a J.D. from the University of South Carolina, and he is admitted to

practice law in South Carolina. Dr. Gordon has published numerous scholarly works on school desegregation, and has prepared more than eighty school desegregation plans since he began his work as a desegregation expert in 1966. Dr. Gordon has been qualified as an expert in school desegregation by federal courts in more than fifty cases, and has appeared in federal court to offer expert testimony on desegregation issues on several hundred occasions. Dr. Gordon also recommended and helped plan the first magnet schools ever used for school desegregation purposes, and he has assisted numerous school systems in drawing magnet school funding proposals. TR at 283–84; 317–19.

After careful research and consideration, including visits to model magnet schools, Dr. Knight and the other school desegregation and magnet school experts and community representatives on the Mayo Magnet School Task Force unanimously agreed that the Mayo Magnet should maintain a 50/50 racial composition, at least for the first few years of the school's operation. TR at 70, lines 11–25; 71, lines 7–24; 74, lines 3–6, 11–19; 89, lines 5–10 (Hudgens); 93, lines 4–9; 97, lines 8–14; 160, lines 10–16 (Knight); 177, lines 11–13; 180, lines 4–11 (Bates); Knight Dep. at 61, line 25; 65, lines 19–25; 66, lines 5–7; Govt. EX. 1.

Dr. Bates and Dr. Hudgens, the District's desegregation and magnet school consultants and members of the Task Force, were both involved in all phases of developing this original selection and admission criteria. Based on his many years of experience in South Carolina, his knowledge of Darlington County, and the racial makeup of the District,[3] Dr. Hudgens concluded that the District's 50/50 plan was essential, particularly in the early stages of the magnet school's operation. He testified that there was a window of opportunity in Darlington County to establish a successful magnet school, and that a balanced racial makeup would be a key factor in attracting white youngsters to attend a formerly black school. Dr. Bates, who has provided technical assistance to magnet schools

around the country, concurred, stating that the District's 50/50 plan would be the best way to insure the school's success, particularly during the school's early years. TR at 71, lines 7–24 (Hudgens); 177, lines 9–13; 180, lines 4–11 (Bates); Govt. EX. 1.

This conclusion was corroborated by the testimony of Dr. Gordon, the Government's expert who has extensive experience with magnet schools, desegregation plans in general, and with Darlington County's plan in particular. Dr. Gordon testified that the District's 50/50 plan would further the District's desegregation goals by insuring a desegregated student enrollment in the school, and that the exemplary nature of the magnet school program would itself provide a remedy for the stigma inflicted on the Mayo community by the District's operation of an inferior black school. TR at 285, lines 13–22; 287, lines 15–23; 290, lines 15–21; 294, lines 16–25; 295, lines 1–4.

Dr. Hudgens, Dr. Knight, Dr. Bates and Dr. Gordon acknowledged that the District's 50/50 plan might cause the school to open below capacity in the first years and that, initially, black students might be adversely affected. They all agreed, however, that it was necessary to send a clear message to all communities that the school was not identifiable with any particular race. Moreover, Dr. Knight testified that a guaranteed racial balance would be necessary at the beginning to draw white students to a formerly mostly black school that had suffered an inferior reputation. TR at 74, lines 3–6, 9–19 (Hudgens); 97, lines 19–23 (Knight); 178, lines 6–8; 184, lines 3–25; 185, lines 1–14 (Bates); 285, lines 17–22; 287, lines 15–23; 290, lines 15–21; 294, lines 16–21 (Gordon); Govt. EX. 1.

According to Dr. Bates, the Mayo Magnet could not establish and maintain a desegregated student enrollment without a specific mechanism for racial balance. Dr. Bates predicated that there would be sufficient black and white applicants to fill all slots initially and that there would be no disparate impact on either white or black students by

3. As of the 1994–95 school year, in Darlington County, 54% of the students were black and 46% were white. Govt. EX. 16 at 31.

application of the 50/50 ratio. However, even if there is an initial disparate impact, Dr. Bates testified that a fairly rigid racial balance requirement is necessary in the early stages to set an enduring non-racial tone in the community. Dr. Hudgens agreed that the risk of under-utilization of the magnet in the early years was a price worth paying to insure a stable desegregated school. TR at 88, lines 23–25; 89, line 1, 5–10, 16–20; 90, lines 5–7 (Hudgens); 160, lines 5–16 (Knight); 178, lines 6–8; 184, lines 3–25; 185, lines 1–14 (Bates).

Dr. Knight and Dr. Hudgens testified that the District's 50/50 plan would not compromise the school's high standards. There are enough qualified black and white students in the District to meet both requirements. Dr. Knight estimated that there are at least 400 academically qualified black students who could apply for 50% of the 320 total magnet seats. TR at 77, lines 4–15 (Hudgens); 99, lines 13–20; 168, lines 3–6, lines 22–24 (Knight).

Dr. Gordon suggested that the District add an appeal procedure to the enrollment and selection process to insure that exceptional students who do not meet the numerical criteria can still gain admission. Dr. Bates agreed that an appeals process is needed for extraordinary students. Dr. Gordon also suggested increasing the numerical allotment for ninth and tenth graders to approximately 100 students, at least if there are empty seats initially, because older students may be reluctant to transfer to a different high schools. TR at 293, lines 14–17, 22–25; 294, lines 8–10; 311, lines 17–25; 312, lines 1–13 (Gordon); 360, lines 12–24; 361, lines 1–13 (Bates).

After a great deal of careful research, consideration and discussion, Dr. Knight, the school desegregation and magnet school experts, and the other community representatives on the Mayo Magnet School Task Force unanimously agreed that the Mayo Magnet should reserve ten slots per grade level for students from the Mayo community, at least during the initial years of operation. TR at 85, lines 12–17, lines 21–23 (Hudgens); 164, lines 18–24 (Knight); 178, lines 9–14 (Bates); Govt. EXs. 1 & 5.

All of the District and Government experts and other members of the Task Force agreed that a successful Mayo magnet program required a mechanism to insure that students living in the Mayo community were participating in and benefiting from the magnet school program in their neighborhood school. Experience with other magnet school programs suggests that people living in the shadow of the school will be some of the school's best supporters. TR at 85, lines 12–17, lines 21–23 (Hudgens); 98, lines 15–23 (Knight); 178, lines 4–14, 18–23 (Bates); 288, lines 3–9, 13–25; 289, line 1; 289, lines 11–25 (Gordon); Knight Dep. at 22, lines 8–13; 155, lines 11–25; 156, lines 1–17.

Dr. Knight testified that the Task Force and District administrators chose the reserved slots provision, in part, because the magnet programs they visited either reserved slots for community residents or allowed all students in the community to attend. One administrator told Dr. Knight that reserving community seats was one of the key program components because it gave the community a sense of ownership in the school. Dr. Knight emphasized that the school is in the middle of a very well connected community; everyone in the community knows one another, "they look after each other and [she] want[s] them to look after the school." TR at 98, lines 15–23; Knight Dep. at 22, lines 8–13; 155, lines 11–25; 156, lines 1–17.

Dr. Bates testified that educational research demonstrates that programs work much better when there is some feeling of neighborhood ownership. He testified that the District should send a message to the Mayo community that educational resources were finally being allocated evenly. In Dr. Bates's view, the history of discrimination against the black community in Darlington County required that the District send a very strong message that the community's participation in the magnet school is very important to the District. TR at 178, lines 9–25; 179, lines 1–23.

In Dr. Gordon's opinion, a proper desegregation remedy for the Mayo School requires that students from the Mayo community who

had suffered from the stigma inflicted by the District be involved in the school. Tr. at 288, lines 3–9.

Dr. Knight, Dr. Hudgens and Dr. Gordon agreed that slots for the Mayo community will not have any adverse impact on academic standards or the overall quality of the school. TR at 77, lines 4–15 (Hudgens); 99, lines 13–20 (Knight); 288, lines 13–25; 289, line 1; 289, lines 23–25; 290, lines 1–8 (Gordon).

After a great deal of careful research and consideration, Dr. Knight and the other school desegregation and magnet school experts and community representatives on the Mayo Magnet School Task Force unanimously agreed that the Mayo Magnet should maintain a 50/50 racial balance and should reserve seats for students from the Mayo community, at least for the first few years of the school's operation. Nevertheless, the Board declined to follow the well reasoned advice of the Task Force and its own education experts, and chose to eliminate all desegregation mechanisms from the selection and admission criteria.

In her first 60–Day Report to this court, Dr. Knight described the original selection and enrollment process requiring a 50/50 racial balance and Mayo community reserved slots. Dr. Knight shared the original enrollment process with the Board in April 1995. She explained the Task Force's rationale for the process and emphasized that the criteria satisfied the court's mandate. During the course of the grant application process, Dr. Knight also informed the Board that the 50/50 racial balance was consistent with U.S. Department of Education requirements regarding magnet school funding.[4] At the April Board Meeting, certain Board members criticized the mechanism for maintaining a desegregated enrollment and communi-

ty set-aside provisions. Although no vote was taken that evening, Dr. Knight was directed to address the Board's concerns. TR at 99, lines 23–25; 100, lines 1–4, 21–24; 101, lines 1–2; Knight Dep. at 24, lines 21–25; 25, lines 1–3; Govt. EX. 10; Govt. EX. 24; Govt. EX. 29 (with Dr. Knight's handwritten notes); Govt. EX. 42.

On September 11, 1995, the Darlington County School Board approved revised selection and admission provisions. The provisions eliminated the 50/50 racial balance provision and the Mayo community set-asides. The revised criteria contained no mechanisms to insure a desegregated student enrollment or Mayo community representation. TR at 84, lines 15–22 (Hudgens); 182, lines 11–17 (Bates); 195, lines 21–25; 196, lines 1–2; 205, lines 15–25 (McElveen); 224, lines 13–22; 231, lines 19–25; 232, lines 1–9 (Askins); 264, lines 17–25; 265, lines 2–15; 269, lines 23–25; 270, line 1 (Crowley); 291, lines 2–8 (Gordon); Govt. EX. 35.

Dr. Hudgens testified that the revised enrollment criteria failed to insure a desegregated student enrollment from the beginning, and that leaving student racial diversity to chance would cause distrust among the citizens. Dr. Bates agreed that the revised criteria lessened the probability of meeting community expectations and creating a school of which every community could be proud. TR at 84, lines 17–21; 89, lines 3–4 (Hudgens); 182, lines 11–17 (Bates).

Neither Dr. Hudgens nor Dr. Bates participated in developing or approving the revised selection and enrollment procedures. TR at 84, lines 23–25 (Hudgens); 186, lines 12–15 (Bates); Knight Dep. at 162, lines 4–25.

Dr. Gordon testified that the Board simply ignored its own experts—Dr. Knight, Dr.

4. Dr. Knight developed the grant proposal with the knowledge that the first of the four goals for funding set forth in the U.S. Department of Education's grant application for the Magnet Schools Assistance Program states that awards are granted for proposals that are designed to support "[t]he elimination, reduction, or prevention of minority group isolation in public elementary and secondary schools with substantial proportions of minority group children." U.S. Dep't of Educ. Office of Elementary and Secondary Educ., FY 1995 Application for Grants Under the Magnet Schools Assistance Program, at B–1 (1995); *see also id.* at B–14 (Govt. EX. 42). She understood that if these goals were not squarely addressed in the application, funding would be less likely. Dr. Hudgens warned the Board that by changing provisions of the grant application after submission, the Board could be jeopardizing a substantial funding source. TR at 73, lines 8–10 (Hudgens); 95, lines 11–13; 96, lines 1–3 (Knight); Knight Dep. at 25, lines 11–16; 26, lines 4–10; Govt. EX. 16; Govt. EX. 42.

Bates and Dr. Hudgens—in changing the selection criteria. TR. at 291, lines 2–8.

Mr. Askins, the member of the Board who moved for approval of the revised admissions criteria, testified that, in doing so, he had succeeded in removing the word racial in every instance in which it appeared in the old criteria, and in eliminating the Mayo community reserved seats. He admitted that under the revised criteria, there are no mechanisms to insure that the school would have a racially diverse student population, and no mechanism to insure participation by students from the Mayo community. TR at 224, lines 13–22; 227, lines 4–6, 22–25; 228, lines 1–13; 250, lines 3–21; Govt. EX. 29.

Board members who voted for the revised criteria testified that they had done so believing that the magnet school need not further desegregation within the District and that the District need not make any special provision for students from the Mayo community. Mr. McElveen and Mr. Askins both testified that, in their view, this court's previous desegregation order did not require that the Mayo Magnet further desegregation. TR at 213, lines 3–11 (McElveen); 226, lines 7–22 (Askins).

Dr. Hudgens arranged at least four opportunities for Task Force members to visit magnet programs in other areas and testified that there was much to be gained from these visits. He also testified that Board members were invited to visit these magnet schools. Board members McElveen, Askins, and Crowley all testified that they never visited a magnet program despite being invited and urged to do so by District staff. TR at 70, lines 11–25 (Hudgens); 200, line 25; 201, lines 1–18; 202, lines 19–20 (McElveen); 233, lines 18–25; 234, lines 1–4 (Askins); 264, lines 3–15 (Crowley); Govt. EX. 3; Govt. EX. 10.

In adopting its revised admissions criteria, the Board did not seek or heed the recommendations of the Task Force, the District's own administrators, Dr. Hudgens or Dr. Bates. TR at 231, lines 8–25; 231, lines 1–9 (Askins).

Mr. McElveen stated that, in his view, the District's 50/50 plan was "ridiculous" and was not required by this court's order. Mr. Askins stated that admission should be based solely on student ability without regard to race, sex or geography. TR at 206, lines 2–19; 207, lines 6–7, lines 11–17 (McElveen); 225, lines 4–13 (Askins); Govt. EX. 10; Govt. EX. 30; Govt. EX. 35.

### III. CONCLUSIONS OF LAW

On March 1, 1995, this court issued an order finding that the Darlington County School District had engaged in widespread discriminatory practices against black citizens and, in particular, citizens of the Mayo High School community. *Stanley and United States v. Darlington County Sch. Dist.,* 879 F.Supp. 1341, 1388, 1408 (D.S.C.1995). This court detailed the District's acts and omissions regarding students, faculty, principals, curriculum and facilities that have stigmatized Mayo as an inferior black school. Dating back to before 1954, the District's discrimination against black citizens and, in particular, the citizens of the Mayo community, was pervasive, systematic and obstinate. *See generally id.* at 1375–81. This court therefore ordered the District to establish a dedicated magnet at Mayo "to further desegregate the District, remedy past stigma and injury, and equitably distribute the burdens of desegregation." *Id.* at 1389.

Although the order set out clear, specific guidelines to insure that the District further the goal of desegregation, the District was given some latitude in the implementation of the magnet. *See id.* at 1389–90. The evidence shows, however, that the Board failed to meet its obligation to establish a magnet school that remedies the specific constitutional violations found by this court and that furthers desegregation. Accordingly, this court, in its October 25, 1995, Interim Order set forth detailed remedial instructions.

Initially, a school district should be given an opportunity to develop and implement its own plan. The most important consideration, however, remains whether the plan actually works in practice. By removing all desegregation mechanisms from the selection and admission criteria, and by eliminating any reserved seating for students from the Mayo community, the Board jeopardized the

success of the magnet school and the orderly desegregation of the District. As a result, the court will take steps to insure the successful implementation of its Order to establish a Mayo magnet.

■ A federal court's "power to remedy segregation is not exhausted by its issuance of an order that promises to, but does not, work." *Id.* at 1044–45. The decree is merely the "starting point" in the process of shaping a sufficient remedy. *United States v. Lawrence County Sch. Dist.,* 799 F.2d 1031, 1045 (1986), *reh'g and reh'g en banc denied,* 808 F.2d 1063 (5th Cir.1987) (*quoting Swann,* 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971) (a district court's remedy is to be judged solely by its effectiveness)). The court retains jurisdiction to "insure prompt and faithful compliance with its order...." *Lawrence County,* 799 F.2d at 1045 (citation omitted); *see also Hammon v. Kelly,* 830 F.Supp. 11, 13–14 (D.D.C.1993) (citation omitted) (trial court retains jurisdiction to enforce consent decrees and settlement agreements, in the same manner as orders, and this jurisdiction includes the power to prevent parties from repudiating their obligations); *Coalition to Save Our Children v. Buchanan,* 744 F.Supp. 582, 586 (D.Del.1990) (remedial school desegregation decrees may be modified if party entitled to relief can demonstrate that order has not provided the necessary relief); *Davis v. East Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1428–34, 1441 (5th Cir.1983) (affirming district court's order adopting a desegregation plan that superseded a previously ineffective plan).

The Darlington County School District's revised admissions provisions jeopardize the success of the Mayo Magnet as well as the District's overall desegregation goals. The District's failure to implement this court's orders "requires, not just warrants," specific procedures to insure full compliance. *See Lawrence County,* 799 F.2d at 1044. Accordingly, the detailed procedures established in this court's October 24, 1995, Interim Order were necessitated by the District's failure to follow this court's mandate to establish a magnet school that remedies the specific con-

stitutional violations and that furthers desegregation.

In *Davis v. East Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425 (5th Cir.1983), the Fifth Circuit held that racial percentages for magnet schools may be used as part of a court-imposed school desegregation plan "to assure to the greatest extent possible that these voluntary attendance schools not work to undermine the progress of desegregation in the parish," *id.* at 1440.

Similarly, other courts have upheld such provisions. For example, the First Circuit upheld the use of racial percentages for admissions to magnet schools and emphasized that because they "were designed to maximize voluntary desegregation ... magnet schools, in order to prove of value to the desegregation plan, had to be carefully circumscribed to ensure that they would not serve as a haven for those seeking to attend a school predominantly composed of those of their own race." *Morgan v. Kerrigan,* 530 F.2d 401, 423 (1st Cir.1976), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); *see also United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1215 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) (upholding a desegregation plan that included a magnet school program requiring minority enrollment to be within 10% of the system-wide proportion of minority students); *Brinkman v. Gilligan,* 583 F.2d 243 (6th Cir.1978) (approving system-wide desegregation plan that required that each school's ratio be within plus or minus 15% of the system's racial makeup), *aff'd,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

Racially diverse magnet schools have figured extensively in court-ordered school desegregation remedies, and the Supreme Court has consistently approved them as components of a comprehensive plan. As recently as last term, in *Missouri v. Jenkins,* —— U.S. ——, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), the Court emphasized the importance of magnet schools as an intra-district desegregation remedy. *Id.,* 115 S.Ct. at 2051.

■ It is well settled that in school desegregation cases, in which the court sits in equity, "the nature of the violation deter-

mines the scope of the remedy." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Once liability is found a remedy must be tailored to correct "the condition that offends the Constitution." *Id.* at 16, 91 S.Ct. at 1276; *see also Jenkins*, 115 S.Ct. at 2056; *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken II* ).

The level of scrutiny applicable to the 50/50 magnet plan and the Mayo set-aside is not altogether clear. In *Adarand v. Pena*, —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Court considered a disappointed bidder's Fifth Amendment equal protection challenge to a federal subcontractor compensation clause that gave preferential hiring to minority subcontractors. The Court, speaking broadly, held in *Adarand* that all racial classifications, imposed by whatever federal, state or local governmental actor, must be analyzed by the reviewing court under strict scrutiny analysis. *Id.*, 115 S.Ct. at 2112. The Court mandated that such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests. *Id.* However, the Court recognized that remedial measures designed to compensate victims for proven governmental discrimination may still be necessary, and survive even a strict scrutiny analysis:

> We wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.

*Id.* (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519, 100 S.Ct. 2758, 2795, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring)).

■ *Adarand* thus reaffirms that the government remains free to act against the "practice and lingering effects of racial discrimination: and that " 'pervasive, systemat-

ic, and obstinate discriminatory conduct' justified a narrowly tailored race-based remedy." *Adarand*, 115 S.Ct. at 2117 (quoting *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987)). In *Paradise*, the Court upheld strict race-based numerical promotional requirements at the Alabama Department of Public Safety. *Paradise* stressed the importance of insuring compliance with federal court judgments and the long history of resistance to district court orders designed to remedy the discrimination. Thus, the race-based remedy in *Paradise* was sustained only after the Department clearly demonstrated an unwillingness to fulfill its remedial obligations. *Id.* at 170–71, 107 S.Ct. at 1066.

Despite the Court's use of a broad brush in painting the *Adarand* framework, this court is not entirely convinced that strict scrutiny necessarily applies to the specific, unique magnet provisions at issue here: the 50/50 plan, and the Mayo set aside. *Adarand* applies only to "racial classification[s] subjecting that person to unequal treatment ..." *Adarand*, 115 S.Ct. at 2111. It is clear that the Court intends "racial classifications" to include all provisions whereby one racial group is accorded a benefit or preference based solely on race.[5] *See Adarand*, 115 S.Ct. 2097 (minority hiring preference); *Paradise*, 480 U.S. 149, 107 S.Ct. 1053 (promotional preferences accorded minorities); *Wygant v. Jackson Board of Ed.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (race-based shield accorded minority teachers from lay-offs); and *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (city's preference that 30% of its contracting work be awarded to minority businesses).

The precise question is whether the 50/50 plan and the Mayo set-aside are "racial classifications" subjecting any persons to unequal treatment. It is certainly arguable that the 10% set-aside for students from the original Mayo High School zone is not race-

---

5. In its only post-*Adarand* application, the Court in *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995) (challenge to Georgia redistricting legislation in which race

was dominant factor in drawing lines), stated that "laws classifying citizens on the basis of race cannot be upheld unless they are narrowly tailored to achieve a compelling state interest."

based, because testimony at the trial established that both black and white students resided in the original Mayo High School zone. Thus, it is quite possible that white students residing in the former Mayo High School zone may qualify for the Mayo set-aside based on their inclusion in that group. The set-aside is arguably a "geographic classification," rather than a "racial classification." It is, however, clear that black students comprise the majority of students hailing from that zone. Even as to the 50/50 plan, the court is unconvinced that it accords a preference in student enrollment based solely on race because both races are given equal opportunity to apply for the available magnet school seats. Unlike the preference schemes considered in *Adarand, Paradise,* and *Wygant,* the 50/50 plan does not endow any racial group with an advantage, nor inflict any burden on another racial group. Insofar as the 50/50 plan groups students on the basis of race it does so only as a remedial measure to correct the long documented resistance to desegregation in the Darlington School District.

Even prior to *Adarand* some courts had recognized that provisions such as the 50/50 plan could be more accurately described as "race conscious," rather than "race-based." The Third Circuit has held (pre-*Adarand*) that an intermediate standard of review is more appropriate when a given policy is race-conscious but not race preferential. *Kromnick v. School District,* 739 F.2d 894, 903 (3d Cir.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). Race-conscious is defined as a policy that considers race but which ultimately impacts all races equally. *Id.* Even after the Court's decision in *Croson,* 488 U.S. 469, 109 S.Ct. 706, which established strict scrutiny as the single standard for racial classifications by local government, the Sixth Circuit in *Jacobson v. Cincinnati Bd. of Ed.,* 961 F.2d 100, 103 (6th Cir.), *cert. denied,* 506 U.S. 830, 113 S.Ct. 94, 121 L.Ed.2d 55 (1992), found that an intermediate standard was nevertheless appropriate for race-conscious policies, whereas strict scrutiny applied to race preferential policies. *See also Vaughns v. Board of Ed. of Prince George's County,* 742 F.Supp. 1275, 1297 (D.Md.1990) (applying lower level of scrutiny to faculty assignment policy intended to prevent schools from being racially identifiable, but concluding that such policy could withstand strict scrutiny if required).

In a recent post-*Adarand* decision, *Martin v. School District of Philadelphia,* 1995 WL 564344 (E.D.Pa.1995), the court considered an equal protection challenge to a 35%–65% student transfer policy that had been adopted to remedy de facto segregation. In determining for Rule 65, Fed.R.Civ.P., purposes whether Plaintiff had made the necessary showing for preliminary injunctive relief, the court in *Martin* declined to decide which standard—intermediate or strict—applied to the 35%–65% policy. However, the court assumed that strict scrutiny applied and concluded that even under that exacting standard the race-conscious policy at issue there would probably pass constitutional muster because it was narrowly tailored to meet a compelling state interest. Thus, the court denied Plaintiffs' request for preliminary injunctive relief.

Another post-*Adarand* district court asked to approve the terms of a consent decree settling a class action race- and sex-discrimination claim in the secondary education field in Alabama found that *Adarand* strict scrutiny applied to the allocation of 50% set asides for black women. *See Shuford v. Alabama State Board of Education,* 897 F.Supp. 1535 (M.D.Ala.1995). The court concluded, however, that because of the established historical discrimination against minority women in secondary education in Alabama, the set-aside plan was narrowly tailored and justified by a compelling state interest.

The 50/50 plan is more akin to the situation in *Martin,* than that of *Shuford.* Like the plan in *Vaughns* the 50/50 plan is designed to prevent the magnet from becoming racially identifiable, as was the case for so long with the former Mayo High School. Until the Supreme Court elects to furnish guidance as to the appropriate level of scrutiny to "race conscious" student enrollment provisions designed to remedy obstinate historical racial discrimination, lower courts will be left to grapple on their own with this thorny problem. After considering the issue

fully, the court, like the court in *Martin*, finds that it need not determine whether strict or intermediate scrutiny applies to the subject measures because such measures would survive even the highest level of scrutiny.

Here, as in *Paradise*, the District's discrimination against black citizens dating back to before 1954 has been pervasive, systematic and obstinate. Evidence produced at the two-day evidentiary hearing justifies a finding that the District defaulted on its obligation to establish a magnet school that would remedy the effects of past discrimination. After long and careful consideration of all relevant factors, the court finds that the District's 50/50 plan and Mayo set-asides, which were developed by the District's own experts after careful consideration and approved by this court on a temporary basis, are the most narrowly tailored and least burdensome measures to remedy the established constitutional violations. Moreover, those measures serve a compelling government interest. Thus, the instructions for implementation of the magnet school set forth in the October 24, 1995, Interim Order are fully justified by the District's failure to discharge its remedial obligations.

## IV.  CONCLUSION

Based on the foregoing reasons and the cited authorities, IT IS THEREFORE ORDERED that all provisions of the court's October 24, 1995, Interim Order shall remain in effect.

IT IS SO ORDERED.